UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION
_____

TEYWON BECKHAM,

                    Plaintiff,                    Case No. 2:22-cv-22

v.                                               Hon. Hala Y. Jarbou

HEIDI E. WASHINGTON, et al.,

                    Defendants.
_____/

## OPINION

This is a civil rights action originally brought under 42 U.S.C. § 1983 by six state prisoners

housed at the Marquette Branch Prison (MBP) in Marquette, Marquette County, Michigan. In an

order (ECF No. 20) entered on April 1, 2022, the Court dismissed Plaintiff Charles Demario

Johnson for failing to pay $67.00, his proportionate share of the filing fee. In another order

(ECF No. 21) entered that same day, the Court severed the claims of the remaining five Plaintiffs

into separate actions. Each Plaintiff, including Plaintiff Beckham, was ordered to file a second

amended complaint containing only the allegations relevant to that Plaintiff. (*Id.*)

Plaintiff has now filed his second amended complaint (ECF No. 23), as well as a motion

to appoint counsel (*id.*, PageID.210). Former Plaintiff Charles Demario Johnson has also filed a

motion for reconsideration (ECF No. 25) of the Court's order (ECF No. 20) dismissing him as a

Plaintiff.

Under the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996)

(PLRA), the Court is required to dismiss any prisoner action brought under federal law if the

complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks

monetary relief from a defendant immune from such relief. 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). Applying these standards, the Court will dismiss Plaintiff's complaint for failure to state a claim against Defendants Kessler and Minthorn. The Court will also deny Plaintiff's motion to appoint counsel (ECF No. 23, PageID.210), and former Plaintiff Johnson's motion for reconsideration (ECF No. 25). Plaintiff's Fourteenth Amendment equal protection and ADA challenges to the Start Unit, asserted against Defendants Washington, Huss, Pelky, and Erickson, remain in the case.

## Discussion

### I.  Former Plaintiff Johnson's Motion for Reconsideration

Plaintiff Johnson seeks reconsideration of the Court's April 1, 2022, order (ECF No. 20) dismissing him as a Plaintiff for failing to pay $67.00, his proportionate share of the filing fee. In an order (ECF No. 10) entered on February 16, 2022, the Court concluded that Plaintiff Johnson was not indigent and directed him to pay $67.00 within twenty-eight (28) days. Plaintiff Johnson did not do so and, accordingly, was dismissed without prejudice as a Plaintiff.

Under Rule 54(b) of the Federal Rules of Civil Procedure, a non-final order is subject to reconsideration at any time before entry of a final judgment. Fed. R. Civ. P. 54(b); *see also ACLU v. McCreary Cnty.*, 607 F.3d 439, 450 (6th Cir. 2010). Western District of Michigan Local Civil Rule 7.4(a) provides that "motions for reconsideration which merely present the same issues ruled upon by the court shall not be granted." Further, reconsideration is appropriate only when the movant "demonstrate[s] a palpable defect by which the court and the parties have been misled . . . [and] that a different disposition of the case must result from a correction thereof." *Id.*

2

Plaintiff Johnson asserts that he is being punished for doing what other Plaintiffs did—sending his financial statement "for the filing fees to be extracted from [his] prison account." (ECF No. 25, PageID.215.) He argues that he requested that the entire $402.00 filing fee be removed from his account. (*Id.*) Plaintiff Johnson's argument is misplaced. Other Plaintiffs were directed to submit their financial statements to determine whether they qualified to proceed *in forma pauperis*. Plaintiff Johnson's financial documents clearly indicated that he had more than sufficient funds to pay $67.00, his proportionate share of the $402.00 filing fee. He was directed to remit that payment within twenty-eight days and failed to do so. Thus, reconsideration of the Court's order dismissing Plaintiff Johnson is not warranted, and his motion (ECF No. 25) will be denied. If Plaintiff Johnson wishes to present his substantive claims for relief to the Court, he may do so by initiating a new lawsuit.

**II.** **Motion to Appoint Counsel**

As noted above, Plaintiff has requested a court-appointed attorney. Indigent parties in civil cases have no constitutional right to a court-appointed attorney. *Abdur-Rahman v. Mich. Dep't of Corr.*, 65 F.3d 489, 492 (6th Cir. 1995); *Lavado v. Keohane*, 992 F.2d 601, 604–05 (6th Cir. 1993). The Court may, however, request an attorney to serve as counsel, in the Court's discretion. *Abdur-Rahman*, 65 F.3d at 492; *Lavado*, 992 F.2d at 604–05; *see Mallard v. U.S. Dist. Ct.*, 490 U.S. 296 (1989).

Appointment of counsel is a privilege that is justified only in exceptional circumstances. In determining whether to exercise its discretion, the Court should consider the complexity of the issues, the procedural posture of the case, and Plaintiff's apparent ability to prosecute the action without the help of counsel. *See Lavado*, 992 F.2d at 606. The Court has carefully considered these factors and determines that, at this stage of the case, the assistance of counsel does not appear

3

necessary to the proper presentation of Plaintiff's position. Plaintiff's request for appointment of counsel (ECF No. 23, PageID.210) will, therefore, be denied.

### III.    Factual Allegations

As noted above, Plaintiff is currently incarcerated with the Michigan Department of Corrections (MDOC) at MBP, where the events of which he complains occurred. Plaintiff sues MDOC director Heidi E. Washington, as well as the following MBP personnel: Warden Erica Huss, Assistant Deputy Warden Unknown Pelky, Resident Unit Manager Peggy Erickson, and Officers Unknown Kessler and Unknown Minthorn.

Plaintiff alleges that he has been diagnosed with several mental disorders, such as experiencing delusions and hallucinations, depression, and schizoaffective disorder. (ECF No. 23, PageID.203.) He is prescribed numerous medications, such as Haldol, Benadryl, Renron, and Trazodone "for the purpose of subsiding 'hearing voices' which persuade acts of physical endangerment." (*Id.*) Plaintiff "has a history of being in [and] out [of] mental health programs and institutions." (*Id.*)

Plaintiff was placed in MBP's Start Unit in July or August of 2020 "in hopes for mental health treatment and mental health protection." (*Id.*) The Start Unit is an alternative to administrative segregation:

> The Department is in the process of piloting general population Start Units as an alternative placement for eligible prisoners who would otherwise be classified to Administrative Segregation. These units provide a structured environment where prisoners move through progressive levels as the prisoner demonstrates positive behavior and program participation with the goal of reintegrating them back into a traditional general population setting. . . .

> The targeted prisoner population groups for placement in a Start Unit are:

>> Prisoners who have been diagnosed with serious mental illness, as defined by Mental Health Services policy, procedure and protocol, whose disruptive behavior would warrant reclassification to administrative segregation.

Prisoners who refuse to return to a traditional general population setting that has resulted in extended administrative segregation placement.

Prisoners who have a history of repeated disruptive behavior, who would otherwise be classified to administrative segregation for new negative behavior.

Other prisoners who would benefit from placement in the Start Unit based on their disruptive behavior, as approved by the CFA Deputy Director or designee. This may include prisoners who are within one year of their discharge date or who have received positive parole action.

Each prisoner accepted for placement in a Start Unit will be provided intake processing, during which time the prisoner's behavioral history and program needs will be reviewed to develop the prisoner's individualized Start Plan. The Start Plan shall clearly define behavioral benchmarks for increased privileges and programs for the prisoner while housed in a Start Unit.

After intake processing, there are four stages through which prisoners may progress while in a Start Unit. Stage 0 is the most restrictive and Stage 3 is the least restrictive. A prisoner's progression within a Start Unit will be based on the individual prisoner's behavior at each stage and subject to recommendations made by the housing unit team and Security Classification Committee (SCC).

Prisoners in a Start Unit may participate in all activities and services provided to prisoners in a traditional general population setting, subject to restrictions to preserve the custody and security of the facility. This may include restrictions on group activities and activities that require the mass movement of prisoners. Activities that are traditionally provided to general population prisoners in a group setting, or that require mass movement, may instead be provided to these prisoners in the housing unit, the prisoner's cell, or in another specifically designated area of the institution. Activities also may be provided at specifically designated times or under escort, as needed. Personal property also may be restricted or used as an incentive for progression through Start Unit stages.

MDOC Director's Office Memorandum (DOM) 2021-17 (eff. Jan. 1, 2021).

Plaintiff asserts that prior to entering the Start Unit, he experienced several tragedies, including the death of a close family member. (ECF No. 23, PageID.203.) He claims that Defendant Erickson placed him in the Start Unit, telling him that it was "just a step to better placement." (*Id.*, PageID.204.) Plaintiff avers, however, that his "life would change drastically for the worse" after being placed in the Start Unit and refers to the unit as a "secret prison." (*Id.*,

PageID.203–04.) He asserts that the Start Unit is "falsely advertised" so that Defendants Washington, Huss, Erickson, and Pelky can "accumulate additional public funds or funds from philanthropist organizations." (*Id.*, PageID.204.)

Plaintiff suggests that he should not have been placed in the Start Unit because he is not disruptive; he simply has "psychotic depression episodes." (*Id.*) He avers that he has "never demonstrated disruptive behavior." (*Id.*) Plaintiff claims that there are no privileges and programs provided in the Start Unit that he could not receive in general population. (*Id.*) He avers further that he has never been called out by the Security Classification Committee (SCC) to review his placement. (*Id.*, PageID.204–05.) Plaintiff also claims that prisoners in the Start Unit cannot attend religious services. (*Id.*, PageID.205.) He states that the Start Unit has "dog cages" for yard, but that yard time is often taken because Defendant Kessler is a "buddy" of Lieutenant Schroderus (not a party). Plaintiff claims that for "4-5 days straight" Defendant Kessler, Lieutenant Schroderus, and others will "find some type of phenome[non] to take yard, showers, law library computer, not let out the porter, pass out food after guards handle trash, not pass out cleaning supplies." (*Id.*)

According to Plaintiff, he and other mentally ill prisoners are "treated sadistically and maliciously under the belief that [they] are too mentally ill to navigate through the courts." (*Id.*) He asserts that the Start Unit should be found to be unconstitutional, and that he would never have reported mental health issues if he had known "he was walking into 'a secret prison.'" (*Id.*) Plaintiff claims that he would be in danger in general population, but that he "has never agreed to sit in a cell 24 hours a day, day after day." (*Id.*, PageID.206.) He asserts that Defendants are discriminating against him because of his mental illness. (*Id.*)

Plaintiff alleges that January 10, 2022, was a "store day" at MBP. (*Id.*) He claims that after "store days," there will be plastic bags and trash all over the galleries and floor because over three years ago, Defendant Huss removed all trash cans and bags because gangs were making weapons out of trash cans and using the bags to make wine. (*Id.*) Plaintiff claims there "is no such time when trash is not thrown on the galleries." (*Id.*) He avers that Defendant Kessler and Lieutenant Schroderus "exaggerated a response in order to specifically attack the mentally ill." (*Id.*)

According to Plaintiff, the MBP Orientation Rule Book provides that all plastic bags must be turned in the "same day store is received." (*Id.*, PageID.207.) Plaintiff claims, however, that plastic bags are never collected, despite possession of such being contraband. (*Id.*) On January 11, 2022, Defendant Kessler made rounds and asked why there were plastic bags "on the rock." (*Id.*) Plaintiff responded, "I don't know what had control of my mind I did want to harm myself." (*Id.*) Defendant Kessler stated, "If we collect the plastic bags, you retards will only use a sheet!" (*Id.*) Defendant Kessler then issued a misconduct to Plaintiff and other prisoners, charging them with destruction or misuse of property. (*Id.*, PageID.207–208.) Plaintiff claims that Defendant Kessler did not "contact mental health with a referral to report [him] hearing voices." (*Id.*, PageID.208.) Plaintiff avers that this incident exacerbated the side effects of his medications, causing him more anxiety, dizziness, chest pains, and headaches. (*Id.*) Plaintiff claims that to this date, trash and plastic bags are not collected, and that administrators say to "throw [it] on the rock." (*Id.*)

Plaintiff appeared before Defendant Minthorn for a misconduct hearing on January 18, 2022. (*Id.*) Plaintiff requested that Defendant Huss appear as a witness "to vouch [that] no trash cans or bags [are] allowed in [the] Start [Unit]." (*Id.*) Defendant Minthorn denied that request. (*Id.*) He also denied Plaintiff's request to have mental health vouch for the fact that Plaintiff hears voices and has suicidal thoughts. (*Id.*) Plaintiff claims that Defendant Minthorn denied him a "fair and

impartial hearing." (*Id.*) Plaintiff was found guilty, and Defendant Minthorn sanctioned him with the maximum sentence of 30 days' loss of privileges "without contacting mental health during the hearing or sentencing phrase." (*Id.*)

Based on the foregoing, Plaintiff alleges that Defendants Washington, Huss, Pelky, and Erickson unconstitutionally enacted the Start Unit. (*Id.*, PageID.209.) He avers that the Start Unit is vague and unconstitutional because it denies religious services, denies yard regularly, denies law library "constantly," denies trash bags and cans, exaggerates programming, prolongs a stay "due to no graduation or ending period," and fails to operate the SCC. (*Id.*) Plaintiff alleges further that Defendant Kessler violated his First, Fourth, and Eighth Amendment rights by: (1) retaliating against him when Plaintiff "took precaution to protect himself from 'power of suggestion of hearing voices' while in possession of a plastic bag"; and (2) interfering and agitating the side effects of Plaintiff's medications by "using the disciplinary process as a choice of weapon." (*Id.*, PageID.210.) Plaintiff also contends that Defendant Minthorn violated his Fourteenth Amendment due process rights during the disciplinary proceedings. (*Id.*) Plaintiff also alleges violations of the Americans with Disabilities Act (ADA).

Plaintiff seeks injunctive relief in the form of an end to the Start Unit and a finding that DOM 2021-17 is unconstitutionally vague and overbroad. (*Id.*) He also seeks a "suitable placement." (*Id.*) Finally, Plaintiff seeks compensatory and punitive damages against Defendants Kessler and Minthorn. (*Id.*)

## IV.   Failure to State a Claim

A complaint may be dismissed for failure to state a claim if it fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more

than labels and conclusions. *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470–71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(i)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

### A.      Claims Regarding the Implementation of the Start Unit

Plaintiff suggests that Defendants Washington, Huss, Pelky, and Erickson violated the Constitution and the ADA by creating, generating, and implementing DOM 2021-17, which

created the Start Unit. (ECF No. 23, PageID.209.) Plaintiff suggests that the Start Unit is unconstitutional because it: (1) denies religious services; (2) denies yard privileges regularly; (3) denies law library privileges constantly; (4) denies trash bags and cans permanently; (5) prolongs inmates' stay in the Unit "due to no graduation or ending period;" (6) exaggerating programming; and (7) failing to utilize the SCC. (*Id.*) Thus, Plaintiff appears to suggest that the Start Unit violates numerous constitutional provisions, including the First, Eighth, and Fourteenth Amendments.

When taken individually, Plaintiff has not set forth plausible constitutional claims on any of the bases set forth above. For example, while inmates retain a First Amendment right to freely practice their religion, *see O'Lone v. Shabazz*, 482 U.S. 342, 348 (1987), Plaintiff has not set forth any facts regarding his own religious beliefs and how they have been infringed upon by his placement in the Start Unit. *See Kent v. Johnson*, 821 F.2d 1220, 1224–25 (6th Cir. 1987). Likewise, Plaintiff has not alleged any facts regarding how an inability to regularly access the law library has impeded his access to the courts and ability to pursue a nonfrivolous legal claim. *See Lewis v. Casey*, 518 U.S. 343, 349, 351–53 (1996). Plaintiff's claims regarding yard privileges and the denial of trash bags and cans do not state such extreme circumstances that they rise to the level of Eighth Amendment violations as denials of the "minimal civilized measure of life's necessities." *See Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).

Plaintiff's complaints about the constitutionality of the Start Unit essentially rest upon his belief that the Unit discriminates against those who have been classified as suffering from major mental disorders. The Court, therefore, construes Plaintiff's claim regarding the constitutionality of the Start Unit to be premised on a violation of the Fourteenth Amendment's Equal Protection Clause.

The Equal Protection Clause of the Fourteenth Amendment provides that a state may not "deny to any person within its jurisdiction the equal protection of the laws[,]" which is essentially a direction that all persons similarly situated should be treated alike. U.S. Const. amend. XIV; *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985). When a law adversely impacts a "suspect class" such as one defined by race, alienage, or national origin, or invades a "fundamental right" such as speech or religious freedom, the rigorous "strict scrutiny" standard governs, whereby such laws "will be sustained only if they are suitably tailored to serve a compelling state interest." *City of Cleburne*, 473 U.S. at 440. Where legislation singularly and negatively affects a "quasi-suspect" class such as one defined by gender, the level of scrutiny is "intermediate," and the law is valid if it is "substantially related to a sufficiently important government interest." *Id.* at 440–41. However, a state practice generally will not require strict scrutiny unless it interferes with a fundamental right or discriminates against a suspect class of individuals. *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 312 (1976).

Here, Plaintiff does not implicate a fundamental right, and he does not allege that he is a member of a suspect class or that Defendants discriminated against him because he was member of a suspect or quasi-suspect class. "[P]risoners are not a suspect class," *Hadix v. Johnson*, 230 F.3d 840, 843 (6th Cir. 2000), "nor are classifications of prisoners," *Mader v. Sanders*, 67 F. App'x 869, 871 (6th Cir. 2003), for example, prisoners holding the same security classification, *id*. Rather, Plaintiff contends that the structure of the Start Unit discriminates against those prisoners, like him, who have major mental disorders.

Because neither a fundamental right nor a suspect class is at issue, Plaintiff's claim is reviewed under the rational basis standard. *Club Italia Soccer & Sports Org., Inc. v. Charter Twp. of Shelby,* 470 F.3d 286, 298 (6th Cir. 2006). "Under rational basis scrutiny, government action

amounts to a constitutional violation only if it 'is so unrelated to the achievement of any combination of legitimate purposes that the court can only conclude that the government's actions were irrational.'" *Id.* (quoting *Warren v. City of Athens*, 411 F.3d 697, 710 (6th Cir. 2005)). To prove his equal protection claim, Plaintiff must demonstrate "intentional and arbitrary discrimination" by the state; that is, he must demonstrate that he "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

The threshold element of an equal protection claim is disparate treatment. *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006); *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011) ("To state an equal protection claim, a plaintiff must adequately plead that the government treated the plaintiff 'disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis.'") (quoting *Club Italia Soccer & Sports Org., Inc. v. Charter Twp. Of Shelby*, 470 F.3d 286, 298 (6th Cir. 2006)). "'Similarly situated' is a term of art—a comparator . . . must be similar in 'all relevant respects.'" *Paterek v. Vill. of Armada*, 801 F.3d 630, 650 (6th Cir. 2015) (quoting *United States v. Green*, 654 F.3d 637, 651 (6th Cir. 2011)); *see also Nordlinger*, 505 U.S. at 10; *Tree of Life Christian Sch. v. City of Upper Arlington*, 905 F.3d 357, 368 (6th Cir. 2018) ("A plaintiff bringing an equal protection claim must be 'similarly situated' to a comparator in 'all relevant respects.'").

As noted above, Plaintiff contends that inmates in the Start Unit are not allowed to attend religious services. (ECF No. 23, PageID.205.) Moreover, he avers that yard privileges are often cancelled for the "mentally ill" even when Plaintiff can see "other prisoners in general population on the yard." (*Id.*) Plaintiff also contends that the mentally ill are often denied showers, the law

library, the porter, cleaning supplies, and other needs. (*Id.*) Given these allegations, the Court concludes that Plaintiff has set forth a plausible Fourteenth Amendment equal protection claim regarding the constitutionality of the Start Unit against Defendants Washington, Huss, Pelky, and Erickson.

Plaintiff also suggests that these Defendants' implementation of the Start Unit violates the ADA. (*Id.*, PageID.209.) Title II of the ADA provides, in pertinent part, that no qualified individual with a disability shall, because of that disability, "be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *Mingus v. Butler*, 591 F.3d 474, 481–82 (6th Cir. 2010) (citing 42 U.S.C. § 12132). Here, Plaintiff avers that the mentally ill inmates, including himself, in the Start Unit have not been provided access to several services and programs because of their disability. The Court, therefore, concludes that Plaintiff has also set forth a plausible ADA claim against Defendants Washington, Huss, Pelky, and Erickson.

### B.     Claims Against Defendant Kessler

#### 1.     First Amendment Retaliation Claim

Plaintiff alleges that Defendant Kessler retaliated against him in violation of the First Amendment when he issued a misconduct after Plaintiff "took precaution to protect himself from 'power of suggestion of hearing voices' while in possession of a plastic bag." (ECF No. 23, PageID.209–210.)

Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). In order to set forth a First Amendment retaliation claim, a plaintiff must establish three elements: (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was

motivated, at least in part, by the protected conduct. *Id.* Moreover, a plaintiff must be able to prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct. *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

While Plaintiff believes that he was protecting himself from self-harm by throwing trash and plastic bags out of his cell, doing so is not protected conduct because such behavior falls under destruction or misuse of property, a Class II misconduct. *See* MDOC Policy Directive 03.03.105, Attach. B (eff. July 1, 2018); *see also Lockett v. Suardini*, 526 F.3d 866, 874 (6th Cir. 2008); *Caffey v. Maue*, 679 F. App'x 487 (7th Cir. 2017) (holding that an inmate's name-calling of guards (calling them unprofessional) was a challenge to the guards' authority that was not protected by the First Amendment); *Felton v. Huibregtse*, 525 F. App'x 484, 487 (7th Cir. 2013) (holding that the use of disrespectful language was not protected conduct) (citing cases); *Freeman v. Tex. Dep't of Crim. Justice*, 369 F.3d 854, 858, 864 (5th Cir. 2004) (concluding that an inmate who accused a chaplain of theological errors during a religious service had engaged in an unprotected challenge to institutional authority). Moreover, the Start Unit rules provide that trash "will not be thrown onto the gallery or flushed down the toilet." (ECF No. 9-10, PageID.116.) Because Plaintiff did not engage in protected activity when he threw trash and plastic bags out of his cell, he cannot maintain his First Amendment retaliation claim against Defendant Kessler. That claim will, therefore, be dismissed.

### 2.    Fourth Amendment Claim

Plaintiff vaguely contends that Defendant Kessler's actions violated his Fourth Amendment rights. (ECF No. 23, PageID.210.)

In *Hudson v. Palmer*, 468 U.S. 517 (1984), the Supreme Court considered and rejected a Fourth Amendment claim based upon a prison official searching a prisoner's cell and destroying

14

some of his legal papers in the process. *Id.* at 519, 535. The prisoner claimed that the prison official's conduct constituted an unreasonable search and seizure of his property, in violation of the Fourth Amendment. *Id.* at 530. The Court disagreed.

First, the Court recognized that while prisoners are not beyond the reach of the Constitution, "curtailment of certain rights is necessary, as a practical matter, to accommodate a 'myriad of institutional needs and objectives' of prison facilities, . . . chief among which is internal security." *Id.* at 523–24 (internal citation omitted). The Court then determined that the official's search of the prisoner's cell did not violate the Fourth Amendment because "society is not prepared to recognize as legitimate any subjective expectation of privacy that a prisoner might have in his prison cell." *Id.* at 526. According to the Court, "[a] right of privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continual surveillance of inmates and their cells required to ensure institutional security and internal order." *Id.* at 527–28. For similar reasons, the Court held that the Fourth Amendment "does not protect against seizures in a prison cell." *Id.* at 528 n.8.

Like in *Hudson*, Plaintiff simply has no expectation of or right of privacy in his prison cell. The Court, therefore, will dismiss Plaintiff's Fourth Amendment claim against Defendant Kessler.

### 3.     Eighth Amendment Claim

Plaintiff also contends that Defendant Kessler violated his Eighth Amendment rights by demonstrating deliberate indifference to his mental conditions. (ECF No. 23, PageID.210.) Specifically, Plaintiff suggests that Defendant Kessler violated his Eighth Amendment rights by issuing the misconduct, which exacerbated the side effects of Plaintiff's medications, causing him to experience higher anxiety, dizziness, and headaches. (*Id.*) Plaintiff suggests that Defendant Kessler used the "disciplinary process as a choice of weapon." (*Id.*) He avers further that Defendant Kessler intended to interfere with his medical treatment. (*Id.*, PageID.207.)

15

The Eighth Amendment prohibits the infliction of cruel and unusual punishment against those convicted of crimes. U.S. Const. amend. VIII. The Eighth Amendment obligates prison authorities to provide medical care to incarcerated individuals, as a failure to provide such care would be inconsistent with contemporary standards of decency. *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976). The Eighth Amendment is violated when a prison official is deliberately indifferent to the serious medical needs of a prisoner. *Id.* at 104–05; *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001).

Deliberate indifference may be manifested by a doctor's failure to respond to the medical needs of a prisoner, or by "prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983." *Estelle*, 429 U.S. at 104–05.

A claim for the deprivation of adequate medical care has an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To satisfy the objective component, the plaintiff must allege that the medical need at issue is sufficiently serious. *Id.* In other words, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm. *Id.* The objective component of the adequate medical care test is satisfied "[w]here the seriousness of a prisoner's need[] for medical care is obvious even to a lay person." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 899 (6th Cir. 2004); *see also Phillips v. Roane Cnty.*, 534 F.3d 531, 539–40 (6th Cir. 2008). Obviousness, however, is not strictly limited to what is detectable to the eye. Even if the layman cannot see the medical need, a condition may be obviously medically serious where a layman, if informed of the true medical situation, would deem the need for medical attention clear. *See, e.g.*, *Rouster v. Saginaw Cnty.*, 749 F.3d 437, 446–51 (6th Cir. 2014) (holding

16

that a prisoner who died from a perforated duodenum exhibited an "objectively serious need for medical treatment," even though his symptoms appeared to the medical staff at the time to be consistent with alcohol withdrawal); *Johnson v. Karnes*, 398 F.3d 868, 874 (6th Cir. 2005) (holding that prisoner's severed tendon was a "quite obvious" medical need, since "any lay person would realize to be serious," even though the condition was not visually obvious). If the plaintiff's claim, however, is based on "the prison's failure to treat a condition adequately, or where the prisoner's affliction is seemingly minor or non-obvious," *Blackmore*, 390 F.3d at 898, the plaintiff must "place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment," *Napier v. Madison Cnty.*, 238 F.3d 739, 742 (6th Cir. 2001) (internal quotation marks omitted).

The subjective component requires an inmate to show that prison officials have "a sufficiently culpable state of mind" in denying medical care. *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000). Deliberate indifference "entails something more than mere negligence," but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. To prove a defendant's subjective knowledge, "[a] plaintiff may rely on circumstantial evidence . . . : A jury is entitled to 'conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Rinehart v. Scutt*, 894 F.3d 721, 738 (6th Cir. 2018) (quoting *Farmer*, 511 U.S. at 842)).

Here, Plaintiff has failed to allege facts suggesting that Defendant Kessler was aware of any risk to Plaintiff's health or safety and disregarded such risk by issuing the misconduct. While Defendant Kessler may have been aware that Plaintiff suffers from mental illness, nothing in the

17

complaint leads to a conclusion that Defendant Kessler intentionally interfered with Plaintiff's treatment by issuing the misconduct. *See Estelle*, 429 U.S. at 104–05. Plaintiff has failed to allege facts suggesting that Defendant Kessler knew that Plaintiff would suffer increased side effects upon receiving the misconduct. The Court, therefore, will dismiss Plaintiff's Eighth Amendment claim against Defendant Kessler.

### 4.   ADA Claims

Plaintiff also vaguely suggests that Defendant Kessler's actions violated his rights under the ADA. (ECF No. 23, PageID.210.) As noted above, Title II of the ADA provides, in pertinent part, that no qualified individual with a disability shall, because of that disability, "be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *Mingus*, 591 F.3d at 481–82 (citing 42 U.S.C. § 12132). Plaintiff's second amended complaint is devoid of facts from which the Court could infer violations of the ADA by Defendant Kessler. Accordingly, Plaintiff's ADA claims against Defendant Kessler will be dismissed.

### C.   Claim Against Defendant Minthorn

Plaintiff also contends that Defendant Minthorn violated his Fourteenth Amendment due process rights during his misconduct proceedings. (ECF No. 23, PageID.210.) Specifically, Plaintiff avers that Defendant Minthorn: (1) refused to call Defendant Huss as a witness; (2) refused to consider the MBP rule regarding turning in plastic bags after store days; and (3) refused to allow mental health providers as witnesses to Plaintiff's mental illness. (*Id.*)

"The Fourteenth Amendment protects an individual from deprivation of life, liberty or property, without due process of law." *Bazzetta v. McGinnis*, 430 F.3d 795, 801 (6th Cir. 2005). To establish a Fourteenth Amendment procedural due process violation, a plaintiff must show that one of these interests is at stake. *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). Analysis of a

procedural due process claim involves two steps: "[T]he first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient . . . ." *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989) (citations omitted).

The United States Supreme Court long has held that the Due Process Clause does not protect every change in the conditions of confinement having an impact on a prisoner. *See Meachum v. Fano*, 427 U.S. 215, 225 (1976). In *Sandin v. Conner*, the Supreme Court set forth the standard for determining when a state-created right creates a federally cognizable liberty interest protected by the Due Process Clause. 515 U.S. 472, 484 (1995). According to that Court, a prisoner is entitled to the protections of due process only when the sanction "will inevitably affect the duration of his sentence" or when a deprivation imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 486–87; *see also Jones v. Baker*, 155 F.3d 810, 812 (6th Cir. 1998); *Rimmer-Bey v. Brown*, 62 F.3d 789, 790–91 (6th Cir. 1995).

Plaintiff attached copies of the misconduct documents to his first amended complaint. (ECF No. 9-10, PageID.113–116.) Those documents indicate that on January 11, 2022, Defendant Kessler wrote Plaintiff a misconduct for destruction or misuse of property. (*Id.*) A misconduct charge for destruction or misuse of property is a Class II, or minor, misconduct under the MDOC disciplinary regime. *See* MDOC Policy Directive 03.03.105, Attach. B (eff. July 1, 2018); *see id.* ¶ B. Plaintiff could not have been denied good time or disciplinary credits as a result of a Class II misconduct. *See id.* ¶ AAAA. The Sixth Circuit routinely has held that misconduct convictions that do not result in the loss of good time are not atypical and significant deprivations and therefore do not implicate due process. *See, e.g.*, *Ingram v. Jewell*, 94 F. App'x 271, 273 (6th Cir. 2004),

19

*overruled on other grounds by Maben v. Thelen*, 887 F.3d 252 (6th Cir. 2018); *Carter v. Tucker*, 69 F. App'x 678, 680 (6th Cir. 2003); *Green v. Waldren*, No. 99-1561, 2000 WL 876765, at *2 (6th Cir. June 23, 2000); *Staffney v. Allen*, No. 98-1880, 1999 WL 617967, at *2 (6th Cir. Aug. 12, 1999).

Plaintiff also cannot allege that he suffered an "atypical and significant" deprivation. *Sandin*, 515 U.S. at 486–87. Plaintiff's misconduct documents indicate that he received 30 days' loss of privileges. (ECF No. 9-10 PageID.113–116.) Pursuant to MDOC Policy Directive 03.03.105, the "loss of privileges" sanction involves the loss of various privileges, such as access to the day room, exercise facilities, group meetings, "[o]ut of cell hobbycraft activities," the kitchen area, the general library (not including the law library), movies, music practice, and other "[l]eisure time activities." MDOC Policy Directive 03.03.105, Attach. E (eff. July 1, 2018). Federal courts consistently have found that prisoners have no constitutionally protected liberty interest in prison vocational, rehabilitation, and educational programs or activities under the Fourteenth Amendment. *See, e.g.*, *Moody v. Daggett*, 429 U.S. 78, 88 n.9 (1976) (holding that the Due Process Clause was not implicated by prisoner classification and eligibility for rehabilitative programs, even where inmate suffers "grievous loss"); *Argue v. Hofmeyer*, 80 F. App'x 427, 429 (6th Cir. 2003) (finding that prisoners have no constitutional right to rehabilitation, education or jobs); *Canterino v. Wilson*, 869 F.2d 948, 952–54 (6th Cir. 1989) (concluding that prisoners have no constitutional right to rehabilitation); *Antonelli v. Sheahan*, 81 F.3d 1422, 1431 (7th Cir. 1996) (finding that participation in a rehabilitative program is a privilege that the Due Process Clause does not guarantee); *Rizzo v. Dawson*, 778 F.2d 527, 531 (9th Cir. 1985) (concluding that prisoners have no constitutional right to rehabilitative services). Plaintiff, therefore, cannot maintain his

Fourteenth Amendment due process claim against Defendant Minthorn, and such claim will be dismissed.

### Conclusion

Having conducted the review required by the Prison Litigation Reform Act, the Court determines that Defendants Kessler and Minthorn will be dismissed for failure to state a claim, under 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c). Plaintiff's Fourteenth Amendment equal protection and ADA challenges to the Start Unit, asserted against Defendants Washington, Huss, Pelky, and Erickson, remain in the case. The Court will also deny Plaintiff's motion to appoint counsel (ECF No. 23, PageID.210), and former Plaintiff Johnson's motion for reconsideration (ECF No. 25).

An order consistent with this opinion will be entered.


Dated:   April 29, 2022                        /s/ Hala Y. Jarbou
                                               HALA Y. JARBOU
                                               UNITED STATES DISTRICT JUDGE